The 4th District Appellate Court of the State of Illinois has now convened. The Honorable Catherine E. Zienoff presiding. Good morning, counsel.  This is People of the State of Illinois v. Travis Wiley, 4-240186. Would counsel identify themselves for the record, please? First, counsel, for the appellant. Laura Peters for the defendant appellant. Timothy J. Londrigan for the appellate prosecutor's office. Thank you very much. Counsel, for the appellant, you may begin your argument now. Thank you. Good morning, your honors. May it please the court and counsel. My name is Laura Peters, and I'm here today on behalf of my client, the defendant appellant in this case, Mr. Travis Wiley. And as your honors know, Mr. Wiley is raising five issues here in this appeal. Time permitting, I would like to try to touch on all five of those issues. We'll see how overly ambitious that is as we get to it. But just for the sake of simplicity, I will be, my plan is to go in the order that the issues were briefed. So to jump right into the first issue in this case, Travis Wiley was not proven guilty beyond a reasonable doubt of first degree murder here. And I think it is important to note, again, that the standard here is proof beyond a reasonable doubt, not what might have happened, what could have happened, or even what was more than likely to have happened. It's beyond a reasonable doubt. And so the state had to prove three things in this case. First, that A.H.'s cause of death was actually abusive head trauma. Second, that Mr. Wiley is the person that was responsible for that head trauma. And third, that Mr. Wiley acted knowingly in causing that head trauma. And the evidence in this case shows that the state was not able to prove any of those three factors beyond a reasonable doubt, let alone all three. Nancil, good morning. With respect to this first issue, the Supreme Court has told us certainly that a review of sufficiency of the evidence really has to be limited to the evidence that was actually admitted at trial. However, you are suggesting in your argument and in your brief that this court consider some of the medical journals that you talk about in your brief, cite in your brief, but were not admitted at trial. How can this court take that into consideration without any authority that actually has to do with the sufficiency of the evidence on direct appeal? So, again, in the reply brief, and I believe in the opening brief as well, we do cite to a number of cases, I believe it's on pages five and six of the reply brief, a number of cases where on appeal courts have considered secondary sources. And certainly, we're not introducing these sources as new evidence. These are the exact issues that were argued by trial counsel in the trial court. And even setting aside all the secondary sources that we've cited, there was evidence put forth at trial through the testimony of Dr. Turner that abusive head trauma is not a certain diagnosis here. It's an untested hypothesis. Did the charge include abusive head trauma? I don't believe it used the exact phrasing, no. Okay. So that's not an element of the offense, correct? They just had to establish that there was a homicidal death.  And the way that the state chose to prove that was to say- That's not the way you argued it. You said that the state had to prove that it was by abusive head trauma, and I don't think that's true. Well, certainly, the state had to prove that there was abusive contact here. And specifically, at trial, their argument was that this was abusive head trauma. That was the diagnosis that all of their experts gave, that this was abusive head trauma. And as I said, Dr. Turner testified at trial about the controversial nature of abusive head trauma as a diagnosis. So even if your honors don't consider the additional secondary sources we've provided here in the briefing, there is on page 1364 of the record, Dr. Turner does go into the fact that the National Board of Medical Examiners used to have a positional statement on abusive head trauma, endorsing it. They've since revoked that endorsement because they have recognized that there are doubts here. This is not a certain thing. I get the impression from the- I'm sorry, go ahead. Go ahead. That's all right, Justice DeArmond, go ahead. I get the impression from the record that Dr. Turner wasn't very persuasive. I would disagree with that, Your Honor. And I think the fact that- I didn't agree with the doctor. They concluded directly opposite of what the doctor testified to. So I'd say that was pretty conclusive that they didn't give the doctor much credit. So the fact that the doctor says abusive head trauma is something that there might be questions about, that doesn't disqualify abusive head trauma by itself, does it? I- just to address the fact that- I mean, the jury here sent out a note saying we're not able- we're not having- we're not able to come to an agreement here, what should we do? So to say that the jury just looked at Dr. Turner's testimony and said, none of this can possibly be true and didn't buy it, I don't think is borne out by the record in this case. I didn't say that. I just said they didn't find the doctor persuasive. I- so I- I again would have to disagree with that just based on the fact that they clearly did have, you know, a back and forth here and- Okay, persuasive but not persuasive enough. How's that? I would say some of the other, you know, trial issues that we'll talk about certainly might have impacted, you know, how they decided to weigh these experts. Since we have so many issues to cover, I'm going to move to a different topic. I'm going to move to a different aspect of sufficiency of the evidence, and that is whether or not it was the defendant who inflicted these injuries causing the death. And Dr. Williams testified that the child A.H. would have lost consciousness within minutes to tens of minutes to at the most an hour after receiving these injuries, which means that the injuries- there was evidence that the injuries occurred while the defendant was watching A.H. Certainly, couldn't the jury rely on that testimony to absolutely conclude beyond a reasonable doubt that it was the defendant who caused the death of this child? Oh, I would again have to say no, Your Honor, respectfully. In this case, again, Dr. Turner testified and the state never responded to- never fully responded to the fact that this could have been the result of a natural disease process. So, to say that this had to have happened, you know, there had to have been some trauma at, you know, within an hour is just not the case here. Well, the jury was entitled, obviously, to weigh the testimony and opinions of each of the experts. I mean, they had the defense expert, Dr. Turner, and the state's experts, correct? The three experts who testified. Correct. There were the state's three experts and then Dr. Turner, yes.  But to further address that point of identity here, again, the current understanding of, you know, trauma in infants shows that there can be something called a lucid interval here. So, it's entirely the fact that, you know, it's entirely possible that this happened up to 72 hours before she actually lost consciousness. So, who testified to a lucid interval? None of the state's witnesses, and I don't believe Dr. Turner talked about a lucid interval. Where does that come from in this record? So, again, Your Honor, it was not- I would agree it was not in the record here. That would be a resource that Your Honors would have to take notice of. Right. Okay. So, to move on to the second issue in this case, I would like to briefly address the 2018 consensus statement that the state relied on here. And, you know, Mr. Wiley acknowledges that expert witnesses may rely on, you know, otherwise inadmissible documents to support their testimony. However, those documents cannot be considered by the jury as substantive evidence against the defendant. And in this case, this consensus statement that the state used was allowed to be considered as substantive evidence here. And it's particularly damaging because of the specific conclusions that this statement made. Specifically- Well, isn't there the possibility that a defendant's attorney thought there advantage for not giving this instruction because there was some testimony that did come out with respect to the questioning or the validity of an abusive head trauma in Dr. Turner's testimony and also cross-examination of the state's witnesses? So, why wouldn't there have been a strategic advantage? In addition, the First District certainly has opined that this instruction, which is usually a civil- an instruction given in a civil case, is confusing. So, in terms of the strategy here, this was not something where there were just a few casual mentions of this statement. The state extensively questioned all of the experts on it and then even brought it up once again during closing arguments, explicitly saying it was as if they, they being the authors of this consensus statement, were warning us about people like Jane Turner. So, this was clearly a focal point. This was very much out in front of the jury. It's not something they were likely to, you know, overlook or forget if defense counsel just didn't bring it up again. So, strategically, to allow the jury to consider this statement substantively just does not make sense. That's not a reasonable strategy. But you didn't give us any criminal case that has used this limiting instruction, right? Right. And so, but if the trial attorney felt that there was an issue with that proposed limiting instruction, the attorney could have suggested a non-pattern instruction that would have apprised the jury that this is not substantive evidence. You can't take this as substantive evidence against Mr. Turner or Mr. White. But there's a pretty high bar, is there not, with regard to the conduct of counsel in terms of trial strategy? Correct. But again, to just allow the jury without any kind of clarification or restriction to consider a statement that goes as far as to even essentially make legal conclusions like telling the jury that the only kind of experts who would say that A.H.T. wasn't a legitimate theory here are defense expert witnesses because they're being paid to do so. It's a particularly damaging document, and to let the jury consider it without any kind of qualification is not a legitimate strategy here, particularly in this case where expert testimony was so important. And so, for the sake of time, I'd like to move on to addressing the third issue here, which is the issue of the prosecutorial misconduct in closing argument through the numerous disparaging comments against Dr. Turner here. And I think People v. Moss, the Illinois Supreme Court case that was cited in both of Mr. Wiley's briefs, is really instructive here. In that case, the prosecutor referred to defense experts as cash-for-trash doctors, and the Supreme Court found that that was completely unacceptable and went further to say that comments denigrating defense witnesses must be strongly condemned. So, counsel, even if we consider that this was a preserved issue, and I'll get to that in a minute, it was not, correct? How do we get from the fact that there may have been comments that were designed to inflame the jury to these comments actually making a difference in the outcome of this case? So, as I said before, I think in this case, obviously, it came down very much to a battle of the experts in terms of who did the jury decide to believe, the state's experts or the defense expert. So, in this case, the prosecutor's comments, and it wasn't just one comment, it was repeated comments, essentially just personally attacking Dr. Turner, very much could have weighed the scale in favor of the state's experts and against Dr. Turner. And again, I'm sorry. No, that's okay. Go ahead. In Moss, the Supreme Court explicitly held that cash for trash doctors was not an acceptable way to discuss expert testimony. And in this case, we have the prosecutor calling Dr. Turner's testimony junk offered for cash. So, I mean, it's essentially the same wording here that the Supreme Court has found to be highly improper. So, for us to look at this issue, the comments themselves aside, how are you suggesting we have to look at it? Are you saying this is plain error? This was not preserved. And as I read and read your brief, you indicated really just in a single sentence at the end of the section that you're asking this court to review that issue either for plain error or ineffective assistance of counsel and refer this court to a couple other pages in your brief addressing completely different issues. So, there's really no argument for this court to rely on and it's not the burden of our court to construct a coherent argument for you. So, what are you telling us today about a plain error argument? Is this first prong? Is it second prong? How are we to look at this? Yes, Your Honor. We're raising this as either ineffective assistance of counsel or as first prong plain error because the evidence in this case was closely balanced. And that discussion, I believe that the citation to earlier in the brief was of the discussion of the closely balanced nature of the evidence in this case. With all due respect, it is not the pages that you have given this court, unless I've misread it, but I've not. So, that aside and whether or not it should be forfeited aside, I think we've covered the merits of it at this point. Do you want to turn to the Frye issue? Sure. I can address the Frye issue. So, as Mr. Wiley has said in the briefs, the trial court erred here in denying him a Frye hearing that he requested on the methodology and the scientific principles behind the abusive head trauma hypothesis here. As Your Honors are aware, scientific evidence is only admissible if it does meet that Frye standard in Illinois. And so, the recent Fifth District case that just came out in 2024, People v. Patak, I think is a perfect illustration of why the trial court here erred in not holding a Frye hearing. As the Patak court noted, there's never been a Frye hearing about abusive head trauma as a general hypothesis or specifically about the link between these retinal hemorrhages and an abusive head trauma diagnosis. And so, the court found that the science here is not unequivocal or undisputed. And in finding that, they cited to a number of cases from Illinois and other jurisdictions that have expressed these serious concerns about both the methodology and scientific principles that underpin this whole abusive head trauma theory. Now, the Patak case in the Fifth District really is distinguishable from our case, is it not? There, the issue was whether retinal hemorrhages or hemorrhaging was a definitive sign of AHT. That's different than we have here. Here, the state's experts never claimed that retinal hemorrhaging was a definitive sign of AHT. They testified that it was one sign or could have been a sign, but that there were other findings that were necessary. So, this isn't the Fifth District case by any means. So, the trial counsel did, in this case, did request a Frye hearing on the AHT specifically about these retinal hemorrhaging. So, I would say that it is certainly applicable in this case. I would also note that the Patak court did find not just that there hadn't been a Frye hearing on these retinal hemorrhages and their correlation with abusive head trauma, there hasn't been a Frye hearing on abusive head trauma, the theory in general here. Well, with all due respect, I think the Fifth District really skipped an important step here in their analysis, which was whether or not opinions about abusive head trauma that are based on observation and experience, that is medical training and experience, are scientific evidence under Frye. I mean, that's step number one, is determine whether we're dealing with scientific evidence. Here, the experts testified that they reached their based on their own observations and medical experience. So, I would make a distinction between what is a result of observation, training, experience, and what is the result of a broader methodology. In a case like this, observations, training, and experience go to things like identifying this is the hemorrhage here to point out these are the specific trauma points, then linking whatever that abnormality is and saying it was caused by abusive head trauma implicates a broader methodology here of how are we diagnosing, how are we linking the specific injuries we're noting to the larger theory here of this was caused by abusive head trauma. I'm not sure where the scientific methodology comes in there. I'm missing that. I guess I would contrast it with a case where if someone got shot and there was a bullet going through their brain, there's a very clear connection between the bullet went through their brain, that's what caused the trauma, that's what caused death. In a case like this, there's a lot more logical leaps that need to happen from there's a retinal hemorrhaging, there's whatever the injury is, to then connect it to, well, that has to be the result of shaking or of some kind of abusive head trauma. There's much more, there are many more logical leaps that have to happen there, and that's the wider methodology of how this is being diagnosed, that's being implicated there. So I see that I'm almost out of time, so I would just say if there aren't any more questions, I would just ask this court to reverse Mr. Wiley's conviction outright as argued in argument one or to reverse his conviction and remand for a new trial as argued in the other issues. Thank you, counsel. You'll have an opportunity for rebuttal. Thank you. Mr. Londrigan. Good morning, your honors, and may it please the court, counsel. I am prepared to address any of the five issues raised by the defendant on appeal. However, I don't want to waste the court's time. I'm perfectly content on standing on my brief. Well, so that you have the opportunity to continue speaking. I do have a question relating to the, well, in part it relates to the improper conduct or comments of the prosecution. Did anyone ask the state's experts if they were being paid? I don't recall reading that question in the record, your honor. Okay. Is it possible that they were being paid? I would think so, yes, unless they were subpoenaed. I mean, there are two of them. I think the pathologist that did the autopsy are probably employed by the state or some governmental agency, I would think, so they're employed indirectly. And if they're subpoenaed, I think they have to give testimony. I don't think they're entitled to compensation beyond that, but as far as the expert that was called to testify by the state, I would assume she was paid, but I have no evidence of that. Well, that isn't in the record, but I guess if I was the defense attorney, I'd want to ask about that since my expert was being excoriated for getting paid $24,000 for this case and plus thousand for another case, which would suggest, yes, this is an expert that's been hired. And on the incidence of either Daubert or accepted scientific theory, it is accurate, isn't it, that there are cases being reversed or vacated in various jurisdictions based on this controversy? The controversy of whether or not the abusive head trauma is always the cause or the correct cause of the diagnosis, correct cause of the death. I'm sorry for interrupting, Your Honor. My understanding of the current situation is not so much abusive head trauma being challenged as SPS, shaken baby syndrome, perhaps being challenged. And that's, as defense counsel noted, I think it has more to do with specific cause and effect. If you're looking at the retinal hemorrhaging as a direct, if you find that, then you must assume that there was shaken baby syndrome associated with that particular injury. Those types of opinions perhaps are being challenged or opinions of that nature. I don't think we have that here at the case at bar. I think we have both pathologists, both testified in conformity that their autopsy of the child revealed severe traumatic injuries that were indicative of HT and that the child must have died of that. And then I think Dr. Williams went on to explain that in his opinion, these types of injuries can be caused by shaking the baby. But in the absence of any type of explanation of other traumatic event, the baby may have been subject to, you're left with no other explanation other than the defendant having inflicted some type of injury upon this child. I mean, we're talking about basically a three-month old child who doesn't have the ability to even roll over in its crib at this age, let alone get up and get involved in some type of traumatic event. The child is in the exclusive care of the defendant. You know, I believe the evidence was overwhelming. The mother leaves at what, 11 or 1030, 11 o'clock in the morning. And by 1117, the defendant is searching on Google for articles concerning the life sentence a man received by killing a three-year-old. That's very circumstantial, but I mean, it clearly shows some intent on the part of this defendant. And then he says he laid the child down at 130, woke up approximately 45 minutes to an hour later to find the child unresponsive. But, you know, the review of his form clearly reveals otherwise. So he's not telling the truth. And so I think it's pretty clear that the evidence is more than sufficient to convict this gentleman of having killed this child. Counsel, I'd like to go back for just a minute to where you started, which was with regard to the prosecutor's closing arguments. And in your brief, you contend that the closing argument was proper in all respects. How do you respond to opposing counsel's mention and discussion of People v. Moss, where a Supreme Court specifically said it was completely unacceptable to call defendants experts, cash for trash, doctors, and some other derogatory statements? Similar statements were made here. Do you not agree that these were improper statements designed to inflame the jury here? I think it's more of an issue of sui generis here because in each case it's going to be different. In the Moss case, I thought that there was a greater amount of these types of statements being made. And I think they were a little bit more over the top. Were there similar statements? Yes, I would concede that. And were all of the statements by the prosecutor in this particular instance, I don't want to say appropriate, but I don't think that they necessarily inflamed the passions of the jury. I think that they attacked the credibility of this expert. Perhaps it's impolite to suggest that they're basically testifying for cash, but I think that's also clear from the evidence. That's exactly what they are doing. Well, the comments here really were designed to absolutely denigrate the defense. When you compare a doctor to the doctors who were paid by the tobacco industry or calling Dr. Turner was making A.H. her victim, that goes beyond the evidence here or goes beyond any questioning of bias. But why, if these remarks were improper, maybe not all of them as perhaps you indicated a minute ago, why aren't they reversible error? Well, one, they've been forfeited. Two, I mean, this is the perfect explanation as to why we insist that these things be preserved, that they be raised at trial and that the trial court be given an opportunity to correct any error that could have been present. To sit back and do nothing and then bring this up on appeal, I think, really puts the state in a difficult position and is a whole intent of forfeiture. However, assuming it's not forfeited and to directly address the court's concern, I would argue that it's a matter of degree. In this particular instance, I don't think that the comments are to a degree where they actually affected the jury's findings and verdict. And that's what this court has to find in order to find this reversible error. In the absence of these comments, would the jury have not found this defendant guilty? I don't think that can reasonably be said. I think this, again, the evidence is overwhelming when you go through it testimony by testimony, which I can do if the court wants for me to recite it again. But, I mean, there is no explanation. Phones do things on their own. That was his explanation as to why he was lying, as to why he, you know, accessed this website about another gentleman killing a small child. When he appeared at the, when the mother of the child appeared on the scene, he's leaving the apartment smoking a cigarette. His comments, oh, she's in there when the mother asked where the child is. He's unconcerned. He doesn't call 911. He calls the mother. And I think he called the mother hours after this traumatic event took place. You know, you've got three expert witnesses, two pathologists and the expert called by the state, all saying this child died of a traumatic head injury, closed head injury. And it wasn't, it's not a closed case. You know, they're not torn by it. There's no evidence of this theory that the defendant came up with, CVST or CSVT, whatever it is. You have to, first of all, prove that there's some type of infection. There's no infection here. They looked for it. They didn't find it specifically. I mean, we have the state's experts saying there's no evidence of infection. And then it has to go from infection to sepsis, which is quite severe, and then from sepsis to the CSVT, and then to stroke, and then to death. But Dr. Turner gave pretty detailed testimony with regard to that progression that he felt started before January 20th, 2018. So there was that testimony. There was that testimony. And I think that's why the state was, I believe, a little agitated with it. I just don't think that testimony is credible. It's not believable. And it's in direct contrast with each of the three experts called by the state who said it wasn't even a close call. They looked for that. They looked for the types of things that the defense experts said was present, and they did not find it. And so their conclusions are directly opposite. So if you believe the state witnesses, you can't possibly give credibility to the defendants expert. Turning for just a minute to the issue of Frye, counsel for the appellant urged this court to at least follow the reasoning in Patak. We know it was Rule 23. Is that case, is it not on point with what we have here? And why shouldn't we use the reasoning to come out in a similar fashion and find that the trial court here should have ordered a Frye hearing? Because it's directly opposite to the cases that the trial court relied upon and that I cited in my brief. And I don't think Patak is well-reasoned. And as the court noted in the initial argument by defendant, I think that they simply missed the point. You know, the issue here is whether or not there's some unique scientific methodology that's being thrown out there as being failsafe. That's saying I, you know, we've come up with this new way of determining something. And whenever we find it, such as the retinal hemorrhaging, perhaps, if you're saying that the presence of that automatically requires one to come to the conclusion that we have shaken baby syndrome or AHT. That's not the testimony that was presented here. The testimony was that from the experience and training that these doctors had and looking at what they discovered through their autopsy, in the case of the expert, you know, reading the autopsy and all the reports that she had, that, excuse me, they came to the conclusion from their expertise and training that the cause of death was AHT. So this is a differential diagnosis. They look at what could have caused these types of injuries that they have found to exist and determining what's the likely cause. And that is not something subject to a fry test as the overwhelming majority of cases have held. And are you referring, there were two first district cases, Cook and Shewitt, what came to that conclusion? Those are the two that I cited in my brief. And I think there were more, but those were the two cases I think the trial court had in front of it. And they were very clear dealing with exactly this specific issue. So if there's no other questions from the court, thank you very much. Thank you, counsel. Ms. Peters, you have an opportunity for rebuttal. Thank you, your honor. I would just like to quickly touch on the state's comment that as the prosecutorial misconduct issue, that this was just an instance of the state being impolite, I believe was the phrasing that he used. This goes beyond being impolite. Again, it implicates the very, not just the credibility, it's going to personal attacks against Dr. Turner here. As your honor pointed out, this is essentially the same wording that the Supreme Court in Moss has held as completely unacceptable. This junk for cash language. And again, it's not just one isolated comment. It's a series of repeated personal attacks against Dr. Turner throughout the state's closing argument. So the characterization of, oh, well, the state was just frustrated and was a little bit impolite, I think is not a realistic reflection of the record here. So that aside, again, I'll come back to how do we look at whether or not there was a palpable effect on the proceeding. We know that a trial court gives the instruction to the jury that the comments in opening and closing statements and arguments by counsel are not evidence and that the case needs to be decided on the evidence that the jury has heard. So how do we get past that? So I would say just to start off with, this case reminds me of the quote, often quoted, U.S. v. Berger, I think, the statement that prosecutors can make hard blows, but not foul blows. In this case, the state made repeated foul blows against Dr. Turner here. And especially in a case like this, where again, it's expert against expert here. The ultimate issue here is did the decide to go with what the state's experts had to say, or with what the defense expert Dr. Turner had to say. And the state, by making these repeated disparaging comments about Dr. Turner, you know, put their thumb improperly on that scale to tip it to say, you know, Dr. Turner is not credible here, simply because she's being paid for her time. You know, and to inject this broader issue kind of with emotional undertones of that Dr. Turner's making A.H. her victim, or re-victimizing A.H. in some way, again, is just a wildly improper way to sort of tip the scale in favor of the state's experts and against Dr. Turner here. So I would, with my time that's left, I would like to briefly touch on the fifth issue here of the unfit juror. And so during deliberation, the jury sent out a note saying specifically that there was a juror that was having problems with their memory and with understanding words, and asked the court for direction, you know, what can we do with this issue. And I don't think it's controversial to say that if there's a juror that is having problems with their memory, is not able to understand words, that is a problem for their fitness to serve on a jury. That note, that came right after a note that said they were, the jury was having trouble coming to a consensus and a verdict. Isn't that correct? I'm, off the top of my head, I don't remember the exact timing, but I'll go with that. I believe the record reflects it came in within a few minutes, or a minute or so after that. I would go with your honor's recollection on that. But again, so it could be related. So it could have been related to that. We're speculating. If we go beyond, the trial court made a record after the jury came in with its verdict, made a record that there had been a note sent back to the jury in response. Isn't that correct? I don't believe that there wasn't a record saying that the note had been sent back. But again, even if the trial court did send a note back to the jurors, I don't think that changes the analysis here. The fact is that we have, we've raised this issue of there's a juror that's potentially unfit. We go off the record, and then we come back and we have a verdict. It's incumbent upon the trial court. It's the trial court's duty to investigate that issue and to make sure and protect Mr. Wiley's right to a fair trial and to be tried by 12 jurors who are competent to hear the case and to render a verdict. That's not what we have here. We don't have any kind of record that the trial court investigated this at all. Because of that, that violated Mr. Wiley's right to a fair and impartial jury in this case. You know, the trial court, as I cited in People v. Hayes, could have stopped deliberations, reopened voir dire, and investigated this issue so that we could say definitively whether this juror was competent and could continue deliberating or not. And I see my time is up, so I would just ask this court, you know, again, either reverse Mr. Wiley's convictions outright or reverse and remand for a new trial. Thank you. Justice Connacht, do you have any further questions? No further questions. Thank you. Justice Dearmond? Nope. All right. Thank you. Thank you, counsel, both of you, for your arguments today. The court will take the matter under advisement and render a decision in due course.